The plaintiff brought the action to restrain the defendants from trespassing on the land described in the complaint by cutting and removing timber therefrom, some of the defendants having a large plant and being engaged extensively in the timber business. The Court granted an injunction to the hearing and the defendants appealed. The plaintiff claimed to be the owner of a large body of land in Dare County, which was granted to John Gray Blount, 7 September, 1795, and said to contain 100,000 acres, according to the quantity given in the grant, (413) but in fact a much larger acreage, that is, about 167,500 acres. The grant is said to embrace all of the county of Dare, except Roanoke and perhaps Durant Island and the Banks. It contains an exception, as to senior grants and entries, which is thus stated in the grant: "Within which bounds there hath been heretofore granted 22,633 acres, and is now surveyed and to be granted to Mr. George Pollock, 9,600 acres of which begins at Samuel Jackson's *Page 333 
northeast corner of 2,000 acres grant on Mill Tail and runs south and east for complement." As the context shows that the word "of" was evidently inserted in the copy by mistake, we have compared it with the original in the office of the Secretary of State and find this to be so. A correct copy is set forth in Manufacturing Co. v. Frey, 112 N.C. at p. 159. The word "of" should be stricken out and the comma should be placed after the word "acres" and before the word "which," instead of after the word "Pollock" and before the figures "9,600," so that the exception when properly quoted will read: "Within which bounds there hath been heretofore granted 22,633 acres, and is now surveyed and to be granted to Mr. George Pollock 9,600 acres which begin at Samuel Jackson's northeast corner of 2,000 acres grant on Mill Tail and runs south and east for complement." The plaintiff asserted title to the entire body of land covered by the said grant, with which it claimed to have connected itself by mesne conveyances. The defendants denied they had committed any trespass on land alleged to be owned by the plaintiff and contended here that the plaintiff had not shown any such trespass by the proof, and further, they averred that they have cut no timber except on land which is either excepted in the Blount grant under which the plaintiff claims, or the title to which as being in the defendants, or those under whom they claim, the plaintiff is estopped to deny, the title to the said lands having been fully adjudicated, and as to some of them the location fixed, in judicial proceedings by which the plaintiff is in law bound and concluded. The two defendant companies disclaim any title to the land in dispute and deny (414) that they have cut any timber on the same or on any land of the plaintiff, or that they have ever authorized any one else to do so, but aver that they have not recently been engaged in the business of cutting timber in Dare County. The plaintiff alleges that all of the defendants are operating under the name of the Buffalo City Mills, Incorporated, and have changed their business name from time to time for the purpose of defeating the process of the Court, and thereby escaping liability for their unlawful trespasses. This is denied by the defendants and the counter-charge made that the plaintiff is an insolvent foreign corporation and a land speculator; that the title to the land claimed by it is radically defective and its boundaries have not been shown, and that the land claimed to be embraced by its outer lines is occupied by hundreds of people whose titles and right of possession are undisputed and unassailable. The defendant sets forth circumstantially its title to the tracts of land upon which it has cut timber. As to the "McRae Tract" of 5,080 acres and the "Blount-Rodman tract" of 5,000 acres, they allege that the plaintiff is estopped by certain judicial proceedings to deny *Page 334 
the title of those under whom the defendants claim and justify their acts, which are alleged to be trespasses, and the defendants deduce their title to these tracts from the State, by showing grants duly issued for the same and judicial proceedings and mesne conveyances, which put the said title in the Buffalo City Mills, Incorporated, Andrew Brown and A. J. Brown, respectively, it being the title under which A. J. Brown claims and his co-defendants so justify. As to the other land, known in the case as the "Pollock tract," the defendant introduced the record of a suit in equity pending in the United States Circuit Court, between the plaintiff and the Buffalo City Mills, Incorporated, and referred specially to the third section of the complainant's bill, in which it is admitted that the said tract of land is not covered by (415) the John Gray Blount patent, but is excepted therefrom, the specific admission being that the exception in that grant, heretofore mentioned, comprises 22,633 acres previously granted, and the Pollock survey of 9,600 acres, for which a grant was to be issued and was in fact afterwards issued to George Pollock upon his entry and survey. This conforms the description of the exception in the Blount grant to what we have said is the correct one. The defendants then show that Pollock's title was thereafter acquired by A. J. Brown, under whom the other defendants, except the two corporations, justify. The plaintiff admitted in this case that it did not own either the McRae or the Blount-Rodman tract, nor does the plaintiff apparently lay any valid claim to the Pollock land, 3000 acres of which it admits has been properly located, though it denies, perhaps, that there has been any correct location of the remainder of that tract or of the McRae and Blount-Rodman tracts. It appears that the grant for the last-named tract which was issued 5 September, 1795, antedates the John Gray Blount patent, issued 7 September, 1795, and the defendants rely on this fact, in addition to the estoppel. There was much testimony taken as to the true location of these three several tracts, the defendants alleging that they had been correctly located and exhibiting carefully prepared maps showing the lines and boundaries, while the plaintiff insisted that they had not been identified by any competent and sufficient testimony, though apparently it does not profess to know or to be able to state where the metes and bounds would be with reference to the lines of the John Gray Blount patent, if they were surveyed and marked on the ground. They simply deny the defendant's location. There was also considerable testimony taken as to the locus in quo or place in which the cutting of the timber was done. The defendant contended that, according to the evidence offered by the plaintiff, the timber alleged to *Page 335 
have been cut was standing on the McRae, the Hunning, the Belangia and the Blount-Rodman tracts, the land lying north of (416) the McRae tract, on which the plaintiff alleges there was cutting of timber, being the Belangia tract, and that on the east the Blount-Rodman tract. The plaintiff introduced the record in the case of the EastCoast Cedar Co. v. Peoples Bank of Buffalo, it being a suit for partition, the object of this proof being to estop the defendants (by the decree declaring the parties to be tenants in common) from denying the title of the plaintiff to the land covered by the Blount patent, the assignors of the respective parties to this action having been parties to that suit. The insolvency of the defendant is alleged in the complaint, but denied in the answer.
The Court enjoined the defendants from cutting trees, logs and timber on or removing them from the premises described in the complaint, being the lands covered by the Blount grant, and enjoined both the plaintiff and the defendant from cutting any timber on the lands described in the McRae, Pollock and Blount-Rodman patents, until the true location thereof is established by surveys made under its orders; and from this order the appeal of the defendant was taken to this Court.
As a general rule, a court of equity did not exercise its jurisdiction so as to enjoin offenses against the public or civil trespasses. The rule as to the former seems to have been without exception (Paul v.Washington, 134 N.C. 363), but, as to the latter and after much hesitation, it finally assumed jurisdiction for the prevention of torts or injuries to property by means of an injunction, under certain safeguards and restrictions, and two conditions were required to concur before it would thus interfere in those cases, namely, the plaintiff's title must (417) have been admitted or manifestly appear to be good, or it must have been established by a legal adjudication, unless the complainant was attempting to establish it by an action at law and needed protection during its pendency, and secondly, the threatened injury must have been of such a peculiar nature as to cause irreparable damage, as, for instance, in the case of the destruction of shade trees or of any other wrongful invasion of property which, by reason of the character of the property or the form of the injury, rendered the wrong incapable of being atoned for by compensation in money, such as torts committed on property *Page 336 
and things having a value distinct from their intrinsic worth: for instance, a pretium affectionis, though not a merely imaginary value. It was held in England that the destruction of timber trees would be enjoined because it was thought to be destructive waste which impaired the substance of the land — an injury to the freehold — but the settled doctrine of this Court was that the mischief wrought by such a trespass was not irreparable in itself, and did not become so, unless it was shown that the trespasser was insolvent. Courts of equity could not conveniently, on account of their peculiar constitution, try the title to land, and hence the necessity for having the title established as one of the essential prerequisites to the exercise of its jurisdiction, and it would not proceed unless it further appeared that adequate redress could not be had at law or the legal remedy would be ineffectual, so that the courts, proceeding according to the course of the common law, could not meet the requirements of justice. The principle upon which courts of equity took cognizance of such cases and administered the right through its remedial process of injunction, with the limitations thereof made necessary by practice and experience, has been clearly settled by the decisions of this Court. Gausev. Perkins, 56 N.C. 177; Irwinv. Davidson, 38 N.C. 311; Thompson v. Williams, 54 N.C. 176; Lyerly v. Wheeler, 45 N.C. 267; Bogey v.(418) Shute, 57 N.C. 174; Thompson v. McNair, 62 N.C. 121; Newton v. Brown, 134 N.C. 439; Lumber Co. v.Wallace, 93 N.C. 22; Lewis v. Lumber Co., 99 N.C. 11. The usual method of showing irreparable damage when the trespass was the cutting of timber trees, was by alleging and proving insolvency. But by the Acts of 1885, ch. 401, it was provided that in an application for an injunction, it shall not be necessary to allege insolvency when the trespass is continuous in its nature or consists in cutting timber trees. Revisal, sec. 807. Laws 1901, ch. 666, provided that when the Judge finds it to be a fact that the contention on both sides, as to the title to the land and the right to cut the timber thereon, is bona fide and is based upon evidence of facts constituting a prima facie title, neither party shall be permitted during the pendency of the action to cut the trees, without the consent of both, until the title is regularly determined. Revisal, sec. 808. But if it is found that the contention of either party is in good faith and is based upon a prima facie title, and the Court is further satisfied that the contention of the other party is not of that character, it may allow the former to cut the trees upon giving bond to secure the probable damage, as required by law. Revisal, sec. 809. We believe this exhibits, in a general way, the course of decision and legislation upon the subject, which has at *Page 337 
this time become an exceedingly important one, in view of the ever-increasing and expanding business of cutting timber trees in our forests for the purpose of sale and manufacture. It would appear that the growth of the timber industry in the State was the cause of the legislation in the recent past, which was enacted, not only to protect our forests against depredations and consequent useless denudations, which is a most wholesome policy, but with the further object of preventing unlawful invasions of lands for the purpose of cutting timber thereon, in favor of the land-owners of the State, who might have found little or no protection in the law as it existed at the time of these (419) radical changes. We should construe and enforce these laws so as to execute this intention, but at the same time the principles of the former system which remain should also be allowed their full operation.
Let us now examine this case in the light of what we have already said. Under the Act of 1885, and even before its passage, it was held that the Court would not interfere with the cutting of timber, if there was no irreparable damage, in its strictly technical sense, and the plaintiff could be compensated in damages; and therefore a bond was required, instead of issuing an injunction, and a receiver was appointed to ascertain and report the quantity and value of the timber cut by the defendant. Notwithstanding the Act of 1885, this Court was still averse to stopping important enterprises by injunction if the plaintiff could otherwise be secured against loss, and in such a case it directed a bond to be given and a receiver to keep the accounts. Lumber Co. v. Wallace, supra; Horton v.White, 84 N.C. 297; Lewis v. Lumber Co., supra. This procedure, as we have seen, is forbidden by the Act of 1901, ch. 666, without the consent of the parties, where the dispute is bona fide on both sides and founded upon titles prima facie good, and only permitted when one of the parties is at fault and the other not. Johnson v. Duvall, 135 N.C. 642. In our case the Court did not proceed altogether under the statutes above enumerated, but found as facts that this is an action to try the title to land, which is chiefly valuable for its timber; that the contention of the defendants is not made in good faith, nor is it based on evidence sufficient to constitute a title prima facie good, and that the plaintiff's contention isbona fide and its evidence shows a prima facie title to the land in dispute. The defendants, upon this finding, are enjoined from cutting any timber upon the McRae, Pollock and Blount-Rodman tracts of land until the true location of those tracts is established by surveys to be made under the order of the Court. We are unable to agree with the learned (420) Judge, for we do not think the order of injunction can be sustained *Page 338 
in law by the case as made in the record. In the present state of the proof, however it may be varied when fully developed by cross-examination at the trial, it can hardly be questioned that the defendants have exhibited a perfect paper title to the three tracts named in the order, and in our judgment they have adduced testimony, oral and documentary, which at this stage of the case is reasonably sufficient and satisfactory to show the location of the land included within the boundaries of those three tracts. It is in both respects, at least prima facie, a good title which they have shown. Indeed, the paper title being without any apparent flaw, we do not see how, under the circumstances, and where no order of survey has been made by the Court, they could have been more definite and explicit in their proof. They have offered evidence of surveys and diagrams of the land, showing the situation of them with reference to the land described in the John Gray Blount grant, as it is alleged to be located, and the plaintiff attempted to meet this proof and overcome it to the extent of convicting the defendants of bad faith by merely asserting, and offering testimony exceedingly general in its character to show that the location is not correct, but without undertaking to inform the Court where the proper one should be with reference to the larger body of land covered by the patent under which they claim. We cannot believe that the law as it formerly was, nor as it now is under recent statutes, contemplating that one of the parties should have an advantage over his adversary upon such a showing. As far as we are able to see, the defendants have acted in apparent good faith in cutting the timber and in defending the suit and they have presented proof which shows prima facie that they have title to those three tracts. The finding of facts by the Court must be set aside, and the contrary finding is made by us, namely, that the defendant has acted, or is acting, in good faith in all respects, and has (421) prima facie a title to the said three tracts of land. While it is true the order for the injunction is not confined to the three tracts we have named, but extends to all the land embraced by the Blount patent, it nevertheless appears that the plaintiff makes no claim to them or either of them. Why should the defendants, at the instance of the plaintiff, be enjoined from trespassing on lands which do not belong to the plaintiff, and to which it makes no claim, as the brief of counsel and the argument before us show? The Court having also enjoined the defendants from cutting timber on any land within the external boundaries of the Blount patent, and outside of the boundaries of the three tracts to which the defendants assert title, the defendants will have to cut timber, under our decision, if at all, at the risk of *Page 339 
violating the order of the Court, and should, therefore, be quite sure that the lands claimed by them are properly located under their paper title. As it now appears, whatever may have been intended, the defendants have in part been enjoined from cutting timber on land which belongs to them, and which, of course, the plaintiff has no right or equity to protect by injunction. We are not aware of any principle requiring the owner of land to stop using it in the ordinary way, until it has been located, and no authority sustaining the validity of an order to that effect was cited to us.
We have not discussed the many other questions argued before us and presented in the elaborate briefs, because in view of the admissions and the facts appearing in the case, we do not find it necessary to do so. It has been assumed, and it so appears at present, that the plaintiff is the owner of the title alleged to have been derived from the Blount patent. The questions so ably and learnedly considered in the brief of plaintiff's counsel as to lis pendens, res judicata and the validity of the deed to the plaintiff, which is questioned by the defendant, and other controverted matters, need not be considered at this stage of the case, and the same may be said of the other questions (422) debated by counsel. Both parties seem to have acted in good faith — the plaintiff, as to the claim under the Blount patent, and the defendants as to their claim of the three tracts named in the order.
As to the exception in the Blount grant, it may now be taken as settled law that a party claiming land to be within an exception must take the burden of proving it. Gudger v. Hensley, 82 N.C. 481; McCormick v.Monroe, 46 N.C. 13; King v. Wells, 94 N.C. 344. The reference in an exception to lands previously entered or granted is sufficient to let in evidence of identification under the maxim, id certum est quod certum reddipotest. Brown v. Rickard, 107 N.C. 639; Gudger v. Hensley, 82 N.C. 481;McCormick v. Monroe, 46 N.C. 13; Melton v. Monday, 64 N.C. 295; Scottv. Elkins, 83 N.C. 424; Midgett v. Wharton, 102 N.C. 14; King v. Wells,94 N.C. 344, and Manufacturing Co. v. Frey, 112 N.C. 158, which relates to this very grant. The exception of a definite number of acres without any description or reference by which to locate them, is of course void for uncertainty, as the reservation of 5,000 acres out of a larger body of land granted. Waugh v. Richardson, 30 N.C. 470; McCormick v. Monroe, supra;Robeson v. Lewis, 64 N.C. 734. But these question have now become immaterial and we refer to them merely to show that they have not been overlooked, as they were strenuously pressed upon our attention. The Pollock grant is of course *Page 340 
within the exception; the Rodman grant also antedates the Blount patent, and the title to the McRae tract is shown by proof sufficient to vest the title in the defendants apart from any consideration of the exception or of plaintiff's title under the Blount patent. We should add that since we have shown, in the statement of the case, the correct wording of the exception in the Blount patent, there can be no doubt that under the cases we have cited it is sufficiently certain to exclude the lands therein described from the operation of the grant.
We would not pass upon the merits of this controversy, and (423) could not do so when considering an interlocutory order for an injunction to the hearing. The truth of the matter cannot now be known, as a great deal of the evidence is merely ex-parte, and has not been subjected to those tests ordinarily required to elicit the truth. What we have said, therefore, should not be used to the prejudice of either party in the further investigation of the case. It is applicable only to the particular question now being decided and does not relate to the merits as they may finally be disclosed.
The finding and order of the Court below as to the McRae, Pollock and Blount-Rodman tracts of land was erroneous, and is, therefore, reversed, and as to those tracts the injunction will be dissolved, as to both parties. In other respects it will remain in force. One-half of the costs of this Court will be paid by the plaintiff and the other half by the defendants.
Error.
Cited: Lumber Co. v. Smith, 146 N.C. 162; Lodge v. Ijames, 156 N.C. 161;Lumber Co. v. Cedar Works, 158 N.C. 164; Thomason v. Hackney, 159 N.C. 304;Foster v. Carrier, 161 N.C. 475.